UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| ROSETTA G. FLOWERS, *et al.*, | ] |
| | ] |
| Plaintiffs, | ] |
| | ] |
| vs. | ] CV-05-CO-02317-W |
| | ] |
| EXXONMOBIL CORPORATION, *et al.*, | ] |
| | ] |
| Defendants. | ] |

MEMORANDUM OF OPINION

I.    Introduction.

The Court has for consideration Defendant ExxonMobil Corporation's

(hereinafter referred to as "ExxonMobil") Motion for Summary Judgment

(Doc. 42), filed on August 14, 2006.[1]  Plaintiffs filed this class action[2] suit

---

[1]On January 19, 2006, defendant ExxonMobil filed its Motion to Dismiss First Amended Complaint.  (Doc. 23.)  The Court entered a briefing schedule (Doc. 25), and the parties fully briefed the motion.  On June 16, 2006, ExxonMobil filed a Supplemental Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. 34), and this Court again ordered the parties to brief the motion.  Because ExxonMobil relied on several affidavits, along with Plaintiffs' cancelled settlement checks, in support of its Supplemental Motion to Dismiss, this Court determined that the motion would be more appropriately considered as a motion for summary judgment.  (Doc. 40.)  ExxonMobil then filed the instant Motion for Summary Judgment in response to the Court's Order.

[2]Plaintiffs define the proposed class as:

All sole proprietorships, partnerships, corporations, other entities,

against ExxonMobil, Louisiana Land & Exploration Co. (hereinafter referred to as "LL&E"), and Burlington Resources Oil & Gas Company, L.P. (hereinafter referred to as "Burlington"), on November 10, 2005, to "redress the devaluation and drainage[3] of Plaintiffs' mineral interests caused by ExxonMobil's operation of Big Escambia Creek field." Plaintiffs amended their Complaint on December 16, 2005, (Doc. 22), and they filed their Second Amended Complaint (Doc. 63) on January 11, 2007, to include allegations of conspiracy to fix prices and abuse of monopsony power under the Sherman Antitrust Act, as well as claims for breach of implied covenants related to their drainage theory of recovery against all three defendants. Plaintiffs also allege claims against defendants LL&E and Burlington for

_____

and natural person in the United States, its territories, possession and protectorates who have received royalty payments from one or more of the Defendants or one of their co-conspirators on gas and other substances produced from the Big Escambia Creek Field ("BEC") under leases which, (a) provide gas royalty payments on a "market value at the well" or "market value at the mouth of the well" basis and (b) are "standard" leases for royalty payment purposes.

(Doc. 63, p. 36.) Plaintiffs allege that the class exceeds six hundred individuals nationwide.

[3]When Plaintiffs use the term "drainage" they are referring to "the migration of oil or gas in a reservoir due to pressure reduction caused by production from a nearby well bottomed in the reservoir." (Doc. 63, p. 10.)

breach of contract, breach of implied covenants and duties, and unjust enrichment related to the underpayment of royalties. *Id*. The issues raised in ExxonMobil's motion have been fully briefed by the parties and are now ripe for decision. For the reasons set forth herein, ExxonMobil's motion is due to be granted in part and denied in part.

II.    Facts.[4]

The plaintiffs in this case own mineral interests in the Big Escambia Creek field (hereinafter referred to as "BEC"), which is located in Escambia County, Alabama, and is comprised of thirty-five sections. There are approximately eighteen wells presently in production within the BEC. Numerous wells have been plugged and abandoned over the years, and the field is not considered "unitized." Some of the plaintiffs in this case have leases with ExxonMobil for gas units that are still in production, while at

---

[4]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, the plaintiffs' complaint, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

least one other plaintiff receives royalties on a lease for a gas unit that has been plugged and abandoned.[5]

The Royalty Owner Plaintiffs' property interests in this case are created by virtue of an oil and gas lease whereby the Ownership Group, including ExxonMobil, obtained the exclusive right to explore and extract the minerals, including all the constituent parts of the Full-Well Stream as defined in Plaintiffs' Second Amended Complaint.   In the BEC, the Ownership Group buys for its own account and then accumulates and sells the product to third parties.  The lease agreements require the Ownership Group to pay the Royalty Owner Plaintiffs payments based on the "market value at the well."  Under the terms of most of the leases, the Royalty Owner Plaintiffs are entitled to receive between 12.5% and 16.66% of the market value of the gas substances produced from the leased land.  The Operator and Ownership Group are responsible for the proper determination, calculation, distribution, and payment of royalties due and

---

[5]Plaintiffs Rosetta G. Flowers, Stanley C. Godwin, Clark Ziglar, Bobby Ziglar, Autry Ziglar, and Sandra Wilson are plaintiffs who receive royalties for gas units that are still in production, while plaintiff Fed Stanley, Jr., receives royalties for a gas unit that has been plugged and abandoned.

owing to the Royalty Owner Plaintiffs on the market value of the Full-Well Stream and gas substances produced in the BEC or in connection therewith.

The production from each BEC well flows into a central gathering system, as well as primary separators, which removes condensate and water. The gas from the wells is then commingled into a single stream and delivered to the Gas Treating Facility where hydrogen sulfide is extracted and converted into elemental sulfur. The gas stream exiting the "tailgate" of the Gas Treating Facility is composed primarily of hydrocarbons, which are then compressed and moved to a dehydration facility, where water is removed. The gas stream then enters the BEC Gas Plant, which extracts the valuable hydrocarbons, such as ethane, propane, butane, and natural gasoline. The marketable products produced at the BEC include sulfur, residue gas, carbon dioxide, and natural gas.

The Ownership Group employs a "cost netting rate" to fix the price of the Full-Well Stream and impose proper and legal costs on the royalty owners. The plaintiffs in this case allege that additional and unreasonable costs are passed down to them through this system of determining royalty payments. From January 1988 through June 2005, Plaintiffs allege that the

Royalty Owner Plaintiffs were paid $12,050,454.53 in royalties.  The class owns a decimal interest in the BEC Field production in the amount of 0.04002928, which, according to Plaintiffs, means that the Ownership Group paid the Royalty Owner Plaintiffs royalties based upon total field production valued at $301,040,501.60.  Plaintiffs contend that the actual value of the total field production for that period was in excess of $3 billion.

On January 26, 1998, Ms. Aline Moye commenced the action entitled *Aline Moye, etc., et al. v. ExxonMobil Corporation, et al.*, Civil Action No. CV-98-20, in the Circuit Court of Monroe County, Alabama.  (Doc. 12.)  The *Moye* action alleged claims against ExxonMobil arising out of its royalty calculation practices with respect to gas and gas substances produced from the BEC.  *Id.*  On March 24, 2003, the Monroe County Circuit Court certified a voluntary, opt-out litigation class of royalty owners in the BEC, pursuant to Alabama Rules of Civil Procedure 23(a) and 23(b)(3).  *Id.*  After approximately seven years of litigation, mediation, and settlement negotiation, the class representatives in *Moye*, class counsel, and ExxonMobil reached a proposed settlement.  (Doc. 24.)  On June 1, 2005, the Monroe County Circuit Court entered an order preliminarily approving

the settlement and conditionally certifying a settlement class.  *Id*.  Notice

of the settlement was both published and mailed to class members.  *Id*.

After the time for objecting to or opting out of the class settlement had

expired and this Court denied Plaintiff's motion for an injunction under the

All Writs Act, the State Court conducted a settlement fairness hearing on

December 20, 2005.  *Id*.  That court then entered its Final Judgment

approving the settlement.

Plaintiffs chose not to opt out of the *Moye* settlement, thus

participating in the benefits of that agreement.  *Id*.  Plaintiffs Flowers and

Godwin were ultimately the only members of the more than six hundred

member settlement class who objected to the proposed settlement in any

form.  *Id*.  Their objections were overruled by the State Court.

III.   Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The party moving for summary judgment "always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d

1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.    Discussion.

According to Plaintiffs, ExxonMobil has combined and conspired with the other members of the Ownership Group to plug and abandon wells in some sections of the BEC, while draining those sections from adjacent and nearby wells, thereby devaluing and misappropriating the plaintiffs' mineral interests.  (Doc. 63, p. 2.)  They allege that "[i]n order to successfully drain [their] minerals, ExxonMobil together with the other Defendants exercised oligopoly powers in the field to prevent exploration, development, and production by other drillers."  Id. By doing this, Plaintiffs contend that ExxonMobil and the other defendants in this case violated the antitrust laws of the United States "and generally failed to act as a reasonably prudent operator in connection with the [BEC]." *Id*.

Plaintiffs' remaining claims against ExxonMobil are for violations of the Sherman Antitrust Act and breach of implied covenants relating to their drainage theory.  (*See* Exhibit A to January 4, 2007, Hearing.)

A.    Release.

As set out in the parties' Settlement Agreement and Release, upon receipt of the settlement proceeds, all claims, asserted or unasserted, were released and discharged.[6]  Like any contract, a release must be interpreted by ascertaining the intentions of the parties expressed in the written agreement, and full effect must be given to those intentions.  *See, e.g., Johnston v. Bridges*, 258 So. 2d 866, 871 (Ala. 1972).  Alabama law requires

---

[6]The Agreement provides, in pertinent part, as follows:

3.17 Release and Indemnification of the Company

a.    Upon the Company's payment of the Settlement Proceeds under paragraph 3.11, above, each Class Representative and Settlement Class Member shall be deemed and adjudged to release, acquit and forever discharge the Company from any and all claims, demands, damages (whether actual or punitive), debts, liabilities, accounts and causes of action of every kind and nature, whether in law or in equity, arising in contract or in tort, including but not limited to claims for alleged fraud, breach of fiduciary duties, accounting, conversion, suppression, negligence, joint enterprise, conspiracy, unjust enrichment, constructive trust, declaratory relief, injunctive relief, wantonness, and every other claim or theory of recovery, legal or equitable, of any type or character whatsoever, directly or  indirectly, whether asserted or not, that he, she or it may have had or may now have as a result of, or arising or resulting from the calculation, payment, and reporting of royalties on natural gas . . . produced from BEC by the Company . . . .

(Doc. 43, Exhibit B.)

that releases "must have effect according to their terms and the intentions of the parties thereto."  Ala. Code § 12-21-109.  Even though the Monroe County Circuit Court did not have jurisdiction to adjudicate claims grounded in federal antitrust law, it did have the jurisdiction to approve a settlement of all claims submitted to it, including antitrust claims.  *See Adams v. Robertson*, 676 So. 2d 1265, 1301 (Ala. 1995) ("Even where a court does not have the power to adjudicate a claim, it may still approve release of that claim as a condition of the settlement of an action before it.").  However, as Plaintiffs point out in their response to ExxonMobil's motion, the *Moye* release does not dispose of the claims alleged in the Second Amended Complaint.[7]  (Doc. 64, p. 5.)   The claims no longer arise out of the

---

[7]The Court is aware of the fact that ExxonMobil's motion for summary judgment was filed prior to the Court granting Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. 54).  (Doc. 61.)  However, in Plaintiffs' previously filed response to ExxonMobil's Supplement to Motion to Dismiss (Doc. 36) they directed the Court's attention to language in paragraph 3.17 of the Settlement Agreement which states:

> The Released Claims do not include claims related to oil or condensate produced from BEC, claims for *drainage*, or any other claims unrelated to the calculation, payment, or reporting of royalties on gas produced from BEC and/or on all gas substances extracted from such gas, as set forth above.

(Doc. 43, Exhibit B (emphasis added).)

calculation, payment, and reporting of royalties.  Instead, as stated above, the claims are based on ExxonMobil's alleged drainage activities, which appear to not be released under the language of the *Moye* settlement. Therefore, the endorsement on the reverse of the *Moye* settlement checks does not appear to be a general release of all Plaintiffs' claims in the Second Amended Complaint.

B.    Plaintiffs' Antitrust Claims.

Plaintiffs contend that "[i]n order to completely and successfully drain Plaintiffs [sic] minerals ExxonMobil prevented competitors from drilling in those shut-in sections."  (Doc. 64, p. 5.)  As a result of ExxonMobil's actions, Plaintiffs allege that their mineral interests in the shut-in sections were devalued.  *Id*.  The "gravamen" of Plaintiffs' complaint is that ExxonMobil's drainage scheme would not have been possible unless they could prevent competitors from drilling in the closed sections.  *Id*.  Plaintiffs believe that by alleging ExxonMobil "committed acts designed to restrain competition in a market for its benefit and to the detriment of others," they have alleged "precisely the kind of injury the antitrust laws were designed to prevent." *Id*.

ExxonMobil argues that it is entitled to summary judgment on the first and second counts of the Second Amended Complaint[8] due to the fact that "[b]ecause no antitrust injury is or can be alleged, plaintiffs cannot assert a valid claim under the federal antitrust laws.  Accordingly, plaintiffs are without standing to assert an antitrust cause of action against ExxonMobil." (Doc. 43, p. 23.)   ExxonMobil avers that Plaintiffs' antitrust claims fail because they have not identified an antitrust injury and are without standing to assert an antitrust cause of action.  (Doc. 43, p. 23.)

An analysis of standing requires the Court to examine the allegations contained within Plaintiffs' Complaint.  *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1497 (11th Cir. 1985).  A private plaintiff seeking to recover under the antitrust laws must have standing beyond the customary "injury in fact" and "case in controversy" required by Article III of the Constitution.  *Florida Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438,

---

[8]ExxonMobil's motion seeks summary judgment on the first through third counts of the Amended Complaint, which were all claims arising under the federal antitrust laws.  However, under the Second Amended Complaint only the first two counts allege antitrust injuries, while Count Three deals with alleged breaches of implied covenants relating to Plaintiffs' drainage theory claims.

1448 (11th Cir. 1991)).  The Eleventh Circuit follows a two-pronged approach in determining whether a plaintiff has standing to bring an antitrust suit.  *Id.* First, the plaintiff must prove that it has suffered an "antitrust injury" - an injury which "the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."  *Id.* (quoting *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)) (internal quotation marks omitted); *see also Amey*, 758 F.2d at 1492-93.  Second, the plaintiff is required to "establish that it is an efficient enforcer of the antitrust laws."  *Id.* (citing *Municipal Utilities Bd. of Albertville v. Alabama Power Company*, 934 F.2d 1493, 1499 (11th Cir. 1991)).  The Eleventh Circuit has adopted the "target area" test that was used by the Fifth Circuit to determine whether a plaintiff has standing and is within the market affected by the alleged antitrust violations.  *See Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1388 (11th Cir. 1990); *Amey*, 758 F.2d at 1496.[9]  The test requires a plaintiff to both "'prove that he is within that sector of the economy endangered by a breakdown of competitive conditions in a

---

[9]The Eleventh Circuit adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

particular industry' and that he or she is 'the target against which anticompetitive activity is directed.'" *Florida Seed*, 105 F.3d at 1374 (quoting *National Indep. Theatre Exhibitors, Inc. v. Buena Vista Distribution Co.*, 748 F.2d 602, 608 (11th Cir. 1984)).  Basically, the plaintiff "must show that it is a customer or competitor in the relevant antitrust market."  *Id.* (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539 (1983)).

ExxonMobil contends that "[i]n an effort to manufacture an effect on competition, plaintiffs characterize their relationship with ExxonMobil as that of a buyer and seller." (Doc. 43, p. 25.)  According to ExxonMobil, this characterization is incorrect as a matter of law, as title to the gas stream upon severance at the well vests in it and not the individual Royalty Owner Plaintiffs.  *Id.*   Therefore, ExxonMobil believes that the correct representation of the basis of Plaintiffs' alleged injury is as a lessor owed a contractual obligation and not as a competitor or market participant.  *Id.* at 26.

In Alabama, as well as several other states, title to oil and gas vests in the lessee under the non-ownership theory, "which recognizes the

migratory nature of oil and gas and requires actual possession to establish ownership." *NCNB Texas Nat. Bank v. West*, 631 So. 2d 212, 223 (Ala. 1993). Therefore, the lessor landowner has "'the right to reduce the oil and gas to possession or to sever this right for economic consideration.'" *Id.* (quoting *Sun Oil Co. v. Oswell*, 62 So. 2d 783, 787 (1953)).  A "royalty owner is not considered . . . to be engaged in any 'sale' of gas." *Mobil Oil Corp. v. Fed. Power Comm'n*, 463 F.2d 256, 260 (D.C. 1971).  For states following both ownership and non-ownership theories, once the gas exits the mouth of the well, "the entire ownership of the gas is in the lessee, none being reserved in the lessor." *J.M. Huber Corp. v. Denman*, 367 F.2d 104, 113-14 (5th Cir. 1966).  The lessor simply is not a seller of gas, to say otherwise would be tantamount to saying that "[t]he developer of a shopping center [becomes] a seller of food because he leases to a supermarket on percentage rental terms." *Mobil Oil Corp. v. Fed. Power Comm'n*, 463 F.2d 256, 262 (D.C. Cir. 1971).

    ExxonMobil urges that since all Plaintiffs owned was a right to receive payments for the sale of gas pursuant to the terms of the mineral leases, Plaintiffs cannot be sellers of natural gas.  (Doc. 43, p. 28.)  According to

ExxonMobil, Plaintiffs cannot be considered consumers in the market for gas processing services because they have no gas to sell or be processed.  *Id.* Therefore, it argues that since Plaintiffs are neither suppliers nor consumers in any relevant market, they could not have suffered an antitrust injury.  *Id.* ExxonMobil relies upon the Tenth Circuit opinion in *Elliott Indus. Ltd. Partnership v. BP America Prod. Co.*, 407 F.3d 1091 (10th Cir. 2005), in which the plaintiffs argued that BP and ConocoPhillips had formed an illegal cartel to horizontally fix prices for gas processing services at anti-competitively high levels and injured the class by depressing the gas' wellhead value resulting in the underpayment of royalties.  *Id.* at 1123. That court upheld the dismissal of the plaintiff's antitrust claims because it failed to allege a proper antitrust injury.  *Id.* at 1125.  The Court noted that any injury suffered by Elliott as a result of the processing fee was "not an antitrust injury because it ha[d] no adverse effect on competition or consumers."  *Id.*  The Tenth Circuit emphasized that "although Elliot trie[d] to characterize itself as a consumer of gas processing services and also a supplier of natural gas and NGLs, Elliott [was] a royalty interest owner in a lease to Appellees," thus concluding that "[m]ere injury as a landlord or

lessor entitled to royalties would not by itself be the kind of injury to competition that the antitrust laws are designed to prevent." *Id.* (citing *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 148 (9th Cir. 1989) (en banc) (holding that the allegations of the lessors that the lessees conspired to depress production of geothermal steam and thereby reduce royalty payments were insufficient as a matter of law because the lessors were not competitors in the same market as the alleged malefactors)).   Even if BP and ConocoPhillips' conduct was harmful to competition, the court did not find that Elliott's injury was a result of the alleged anticompetitive behavior.  *Id.* (citing *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1033 (9th Cir. 2001)).   "An anticompetitive injury would exist if, for example, Elliott had alleged that Appellees were conspiring with gas purchasers to keep downstream sales prices artificially low, such that Elliott's resulting royalty payments were reduced." *Id.*

In a previously filed response to ExxonMobil's Motion to Dismiss, Plaintiffs attempted to distinguish the decision in *Elliott* from the facts of the case at hand.  They noted that in *Elliott*, 407 F.3d at 1123, the relevant market activities were post production activities "one tier removed

downstream from the Plaintiffs' alleged harm," whereas in the present action Plaintiffs have alleged that the anticompetitive acts occurred at, or before, the production level. According to Plaintiffs, "ExxonMobil exercised its monopoly power and conspired with others to shut-in some sections in BEC and proceeded to drain the shut-in sections from nearby wells it owned and controlled." (Doc. 64, p. 5.)

ExxonMobil believes that the antitrust claims raised by Plaintiffs mirror those alleged in *Elliott*, and, therefore, summary judgment should be granted for the same reasons. (Doc. 43, p. 29.) It also urges the Court that the parties' relationship in this case is governed by the mineral lease and not by competition. (Doc. 43, p. 30.) The business relationship between Plaintiffs and ExxonMobil was cemented in the form of the mineral leases. Therefore, ExxonMobil's duties to Plaintiffs are "not derived from the antitrust laws' vision of how competitors should behave; they are derived from the [leases] it has with [P]laintiffs." *UNR Industries, Inc. v. Continental Insurance Co.*, 607 F. Supp. 855, 860 (N.D. Ill. 1984). Finally, ExxonMobil contends that Plaintiffs cannot state a claim based on the allegations relating to gas treating and processing costs - Plaintiffs do not

own the rights to explore for, develop, or market the gas and gas related products.  (Doc. 43, p. 32.)  The mineral leases grant the lessee with the exclusive right to explore, remove, and dispose of the minerals.   In Plaintiffs' complaint, they state "Royalty Owner Plaintiffs' property interests in this matter is created by virtue of an oil and gas lease whereby the Ownership Group and others obtained the exclusive right to explore, develop and extract (produce) the minerals, including all the constituent parts of the Full-Well Stream as defined herein." (Doc. 63, p. 13.) Plaintiffs also allege that "[t]he lessee under an oil and gas lease undertakes the exploration and development of the property to extract the product." *Id*.

Plaintiffs have previously argued that they have alleged an antitrust injury and have standing to bring an action alleging an antitrust violation under Section 4 of the Clayton Act.  (Doc. 27, p. 9.)  They turned to the Supreme Court case of *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), to support an expansive reading of section 4.  In *McCready*, the Court "recognized, '[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers . . . .  The Act is comprehensive in its terms and coverage, protecting all who are made

victims of the forbidden practices by whomever they may be perpetrated.'"

*Id.* at 472 (quoting *Mandeville Island Farms, Inc. v. American Crystal Sugar

Co.*, 334 U.S. 219, 236 (1948)).   Relying on *McCready*, as well as the

Eleventh Circuit opinion in *Amey*, 758 F.2d 1486, Plaintiffs contended that

they have identified a market area that was adversely affected by the

alleged antitrust activities and pleaded facts which support allegations that

their alleged injury occurred within that market area.   Plaintiffs have

offered that they "participate in the market as both producers of Gas

Substances and purchasers of Defendants' gas production services,

therefore, the alleged injuries, i.e., harming the reservoir, etc., flow as a

'foreseeable' and 'necessary' step in furthering the objectives of the

conspiracy . . . ."   (Doc. 27, p. 13.)   They believe that this puts them

"squarely" within the market endangered by the alleged conspiracy.   *Id.*

Plaintiffs argue that their allegations that ExxonMobil's alleged

anticompetitive activities have irreparably harmed the BEC reservoir,

devalued their property, and resulted in the underpayment of royalties are

collectively "antitrust injuries" within the meaning of section 4 of the

Clayton Act.   Plaintiffs cite to *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979),

to support their contention, but the case states that "acquiring goods or services for personal use" is enough to show that there has been an injury to property "when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of."  *Id.* at 339. However, as established in the preceding paragraphs, Plaintiffs are not acquiring goods or services for their own personal use.  Rather, they are royalty owners who have leased away their right to the minerals in question. "In exchange for consideration, including the payment of royalt[ies], ExxonMobil was given the exclusive right to explore for and develop the leased minerals."  (Doc. 68, pp. 3-4.)   They are not consumers of ExxonMobil's services.

Plaintiffs simply have not alleged an antitrust injury because they are neither consumers nor competitors in the relevant market.  Their allegations regarding the exploration, development, and production of the gas substances at the BEC does not establish that they are market participants. In fact, at most, the allegations, if proven, amount to nothing more than a breach of the lease between the parties.  The rights to explore, develop, and produce gas substances at the BEC have been leased to ExxonMobil,

and, therefore, Plaintiffs cannot state a claim for antitrust injury and are without standing to bring such a claim.  Plaintiffs' reliance on *McCready* is misplaced because unlike the plaintiff in that case who was a customer with the right to choose her mental health care provider from the market affected by antitrust violations, Plaintiffs do not have a right to choose gas processors or leasehold developers so as to become participants in the alleged relevant market.

Plaintiffs are correct in asserting that the fact that antitrust liability may be predicated on acts that are otherwise a breach of contract does not immunize the anticompetitive activity.  *See, e.g., Maris Distributing Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1219 (11th Cir. 2002) ("Anticompetitive actions are not immunized by virtue of being memorialized in a contract."); *City of Vernon v. Southern California Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992).  However, a plaintiff must still have standing to bring the antitrust action independent of the claim based upon breach of contract.  Contract power should not be automatically equated with market power because to do so "would place significant additional risks on such legitimate business practices as exclusive dealing

arrangements . . . .” *Maris*, 302 F.3d at 1224 (citing *Queen City Pizza, Inc.*

*v. Domino’s Pizza, Inc.*, 124 F.3d 430, 438 (3rd Cir. 1997)).  Even though “a

party who exercises contract power *may* have market power and *may* violate

the antitrust laws under some circumstances, the mere existence and

exercise of contract power does not show that a defendant had market

power or violated the law.”  *Id.* at 1219 (emphasis in original).

V.     Conclusion.

        For the reasons set forth above, ExxonMobil’s Motion for Summary

Judgment (Doc. 42) is due to be GRANTED IN PART AND DENIED IN PART.

ExxonMobil is entitled to summary judgment as to Counts One and Two of

Plaintiffs’ Second Amended Complaint.

        Done this 2nd day of March 2007.

                                        _____
                                             L. SCOTT COOGLER
                                        UNITED STATES DISTRICT JUDGE
                                                    124153